## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID M. KEENER, Derivatively on Behalf of WEIGHT WATCHERS INTERNATIONAL, INC., <br><br>        Plaintiff, <br><br> v. <br><br> MINDY GROSSMAN, RAYMOND DEBBANE, STEVEN M. ALTSCHULER, M.D., PHILIPPE J. AMOUYAL, CYNTHIA ELKINS JONAS M. FAJGENBAUM, DENIS F. KELLY SACHA LAINOVIC THILO SEMMELBAUER, CHRISTOPHER J. SOBECKI and OPRAH WINFREY, <br><br>        Defendants, <br><br> and, <br><br> WEIGHT WATCHERS INTERNATIONAL, INC., <br><br>        Nominal Defendant. | Case No.: <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** |

Plaintiff David M. Keener ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Weight Watchers International, Inc. ("Weight Watchers" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Weight Watchers against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties that occurred from May 4, 2018 through the present (the "Relevant Period") and have caused substantial harm to Weight Watchers.

## THE PARTIES

### Plaintiff

2.      ***Plaintiff David M. Keener*** is, and was at relevant times, a shareholder of Weight Watchers.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

3.      Nominal Defendant Weight Watchers offers a subscription-based weight loss program and is headquartered at 675 Avenue of the Americas, 6th Floor, New York, New York.  As of February 1, 2019, Weight Watchers had approximately 67 million shares of common stock issued and outstanding.

### Director Defendants

4.      ***Defendant Mindy Grossman*** ("Grossman") is the President and Chief Executive Officer ("CEO"), and a Director of the Company.

5.      ***Defendant Raymond Debbane*** ("Debbane") is the Chairman of the Board of Directors (the "Board").  Defendant Debbane is the Chairman of the Compensation Committee. Debbane is a co-founder and the Chief Executive Officer of The Invus Group, LLC. ("Invus").  He is also the Chief Executive Officer and a director of Artal Group S.A. ("Artal") and the Chairman of the Board of Directors of a number of private companies of which Artal or Invus are shareholders.

Debbane is a managing director of Artal International Management and Artal Luxembourg S.A. Artal Group S.A. is the parent of Artal International Management and Artal International S.C.A. Artal International Management is the managing partner of Artal International S.C.A. Artal International S.C.A. is the parent of Artal Luxembourg S.A.

6.      **Defendant Steven M. Altschuler** ("Altschuler") is a Director of the Company. Defendant Altschuler is a member of the Audit Committee, and the Compensation Committee.

7.      **Defendant Philippe J. Amouyal** ("Amouval") is a Director of the Company. Defendant Amouyal is a member of the Compensation Committee. Amouyal is a Managing Director of Invus.

8.      **Defendant Cynthia Elkins** ("Elkins") is a Director of the Company. Defendant Elkins is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

9.      **Defendant Jonas M. Fajgenbaum** ("Fajgenbaum") is a Director of the Company. Defendant Fajgenbaum is a director of a number of private companies of which Artal or Invus are shareholders. Defendant Fajgenbaum is a Managing Director of Invus.

10.      **Defendant Denis F. Kelly** ("Kelly") is a Director of the Company. Defendant Kelley is the Chairman of the Audit Committee.

11.      **Defendant Sacha Lainovic** ("Lainovic") is a Director of the Company. Since 2007, Defendant Lainovic has been Managing Partner of Invus Financial Advisors, LLC, a New York-based investment firm, which he co-founded.

12.      **Defendant Thilo Semmelbauer** ("Semmelbauer") is a Director of the Company. Defendant Semmelbauer is the Chairman of the Nominating and Corporate Governance Committee.

13.     ***Defendant Christopher J. Sobecki*** ("Sobecki") is a Director of the Company. Defendant Sobecki is a member of the Nominating and Corporate Governance Committee. Defendant Sobecki is a Managing Director of Invus, which he joined in 1989.

14.     ***Defendant Oprah Winfrey*** ("Winfrey") is a Director of the Company.

15.     Defendants Grossman, Debbane, Altschuler, Amouval, Elkins, Fajgenbaum, Kelly Lainovic, Semmelbauer, Sobecki and Winfrey shall be collectively referred to as the "Director Defendants."

**Officer Defendant**

16.     ***Defendant Nicholas P. Hotchkin*** ("Hotchkin") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Weight Watchers.  On August 30, 2018, Defendant Hotchkin sold 131,466 of his personally held shares of Weight Watchers, reaping more than $9.9 million in gross proceeds.  The sale was unusual both as to scope and timing as Defendant Hotchkin had not sold any of his personally held Weight Watchers shares for at least the two prior years.

**Non-Party Artal**

17.     Artal, together with its parents and its subsidiaries (collectively, "Artal"), is the controlling shareholder of Weight Watchers.  Artal acquired Weight Watchers when it was spun-off by H.J. Heinz in 1999.  To fund the acquisition, Artal made a $224 million deposit and then caused Weight Watchers to finance the rest of the acquisition consideration through debt issuances.  Since then, Artal has pocketed billions of dollars by selling Weight Watchers' stock and collecting dividends on its remaining holdings.  As of March 12, 2018, Artal owned more than 29.4 million shares of Weight Watchers common stock, or 44.47% of its then-outstanding shares. Via its contractual relationships with Defendant Winfrey, who then owned 11% of Weight Watchers

common stock, Artal exercised effective control of Weight Watchers throughout the Relevant Period.

18.     On May 7, 2018, Weight Watchers filed a Form S-3 shelf registration statement with the SEC that would permit Artal to sell shares whenever it sought to do so in the future (the "Registration Statement").  The Registration Statement was effective immediately upon filing and expressly incorporated by reference, among other filings with the SEC, the Company's annual report on Form 10-K for the fiscal year ended December 30, 2017, filed with the SEC on February 28, 2018.   Under instructions to Form S-1, Weight Watchers was required to comply with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") disclosure requirements of Item 303 of Regulation S-K in connection with preparing the Registration Statement.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

19.     On May 14, 2018, Weight Watchers filed a final prospectus with the SEC on Form 424b that comprised part of the Registration Statement (with the final prospectus, the "Registration Statement") and priced the secondary stock offering ("SPO") being undertaken for Artal at $69.00 per share   The Registration Statement stated that Artal would sell 7.5 million shares on a firm commitment basis, with Artal willing to sell another 1.125 million shares as the underwriters' overallotment option. The SPO was a success, with all 8.63 million shares being sold, raising approximately $595.5 million in gross proceeds for Artal.

## AUDIT COMMITTEE CHARTER

20.     The Audit Committee's function is the following, in relevant part:

The Audit Committee (the "Committee") of the Board of Directors (the "Board") of Weight Watchers International, Inc. (the "Corporation") shall provide assistance to

the Board with respect to its oversight of (1) the quality and integrity of the Corporation's financial statements; (2) the Corporation's compliance with legal and regulatory requirements; (3) the independent registered public accounting firm's qualifications, performance and independence; and (4) the performance of the Corporation's internal audit function. The Committee's primary duties and responsibilities are to:

- Oversee that management has maintained the reliability and integrity of the accounting policies and financial reporting processes of the Corporation, including internal control over financial reporting and disclosure practices and financial statement audits.

- Oversee that management has established and maintained processes designed to ensure that an adequate system of internal control is functioning within the Corporation.

- Oversee that management has established and maintained processes designed to ensure compliance by the Corporation with all applicable laws, regulations and corporate policy.

- Oversee the quality and integrity of the Corporation's financial statements and the performance of the Corporation's independent registered public accounting firm.

- Prepare such reports that United States Securities and Exchange Commission ("SEC") rules may require to be included in the Corporation's annual proxy statement.

*       *       *

**RESPONSIBILITIES AND DUTIES**

The responsibilities and duties of the Committee shall be as set forth below. The Corporation shall provide appropriate funding, as determined by the Committee, for payment of compensation to the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation and any advisors that the Committee chooses to engage, as well as funding for the payment of ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

**Documents/Reports Review**

1.      Review and discuss with management and the independent registered public accounting firm the Corporation's annual and quarterly financial statements, including the Corporation's disclosures under "Management's Discussion

and Analysis of Financial Condition and Results of Operations", prior to public dissemination.

2. Discuss with the independent registered public accounting firm the matters required to be discussed by applicable auditing standards adopted by the Public Company Accounting Oversight Board (the "PCAOB") and approved by the SEC from time to time, including any critical audit matters.

3. Review and discuss with management and the independent registered public accounting firm the Corporation's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion of earnings press releases and earnings guidance with management may be general in nature and need not take place in advance of each earnings release or each instance in which the Corporation may provide earnings guidance. The Chairperson of the Committee may represent the entire Committee for purposes of this review and discussion.

4. Perform any functions required to be performed by the Committee or otherwise appropriate under applicable law, rules or regulations, the Corporation's bylaws and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC.

5. Review and discuss with the independent registered public accounting firm a draft of the auditor's report.

**Independent Registered Public Accounting Firm**

6. Retain and terminate an independent registered public accounting firm and approve all audit engagement fees and terms. Review the performance of the independent registered public accounting firm. The Committee shall have the authority and responsibility, subject to shareholder approval, to select, evaluate and where appropriate, replace the independent registered public accounting firm. The Committee shall inform the independent registered public accounting firm that it shall report directly to the Committee and is ultimately accountable to the Committee and the entire Board for such firm's review and audit of the financial statements and report regarding financial internal controls of the Corporation. On an annual basis, the Committee should review and discuss with the independent registered public accounting firm all significant relationships the independent registered public accounting firm has with the Corporation to determine the independent registered public accounting firm's independence.

7.  The Committee shall have the authority and responsibility to approve in advance any significant audit or non-audit engagement or relationship between the Corporation and the independent registered public accounting firm, other than prohibited non-audit services. The following shall be prohibited non-audit services: (i) bookkeeping or other services related to the accounting records or financial statements of the Corporation; (ii) financial information systems design and implementation; (iii) appraisal or valuation services, providing fairness opinions or preparing contribution-in-kind reports; (iv) actuarial services; (v) internal audit outsourcing services; (vi) management functions or human resources; (vii) broker or dealer, investment adviser or investment banking services; (viii) legal services and expert services unrelated to the audit; and (ix) any other service that the PCAOB prohibits through regulation.

Notwithstanding the foregoing, pre-approval is not necessary for minor non-audit services if: (i) the aggregate amount of all such non-audit services provided to the Corporation constitutes not more than five percent of the total amount of revenues paid by the Corporation to its independent registered public accounting firm during the fiscal year in which the non-audit services are provided; (ii) such services were not recognized by the Corporation at the time of the engagement to be non-audit services; and (iii) such services are promptly brought to the attention of the Committee and approved prior to the completion of the audit by the Committee or by one or more members of the Committee who are members of the Board to whom authority to grant such approvals has been delegated by the Committee. The Committee may delegate to one or more of its members the authority to approve in advance all significant audit or non-audit services to be provided by the independent registered public accounting firm so long as it is presented to the full Committee at a later time.

\*       \*       \*

**Financial Reporting Process**

10.  In consultation with the independent registered public accounting firm, management and the internal auditors, review the integrity of the Corporation's financial reporting processes, both internal and external. In that connection, the Committee should obtain and discuss with management and the independent registered public accounting firm reports from management and the independent registered public accounting firm regarding: (i) all critical accounting policies and practices to be used by the Corporation; (ii) analyses prepared by management and/or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the effects of all alternative treatments of financial information within generally accepted accounting principles that have been

discussed with the Corporation's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm; (iii) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles; (iv) major issues as to the adequacy of the Corporation's internal controls and any specific audit steps adopted in light of material control deficiencies; and (v) any other material written communications between the independent registered public accounting firm and the Corporation's management.

11.     Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures (if any), on the financial statements of the Corporation.

12.     Consider and approve, if appropriate, major changes to the Corporation's auditing and accounting principles and practices as suggested by the independent registered public accounting firm, management or the internal auditing department.

13.     Establish regular systems of reporting to the Committee by each of management, the independent registered public accounting firm and the internal auditors, regarding any significant difficulties encountered during the course of the review or audit, including any restrictions on the scope of work or access to required information.

14.     Resolve any disagreements between management and the independent registered public accounting firm regarding financial reporting and review any disagreements between management and the internal auditing department in connection with the preparation of the financial statements, restrictions on the scope of work or access to required information.

## AMENDED AND RESTATED CODE OF BUSINESS CONDUCT AND ETHICS

21.     The Company's Amended and Restated Code of Business Conduct and Ethics states

in relevant part:

### Conflicts of Interest; Corporate Opportunities

Directors, officers and employees shall not, during the term of their service to the Company, be involved in any activity that creates a conflict of interest between their personal interests and the Company's interests. As a guide for implementing this policy, no director, officer or employee shall:

- be a consultant to, or a director, officer or employee of, or otherwise operate any other business or activity (collectively, as described in this clause below, a "Conflicting Business"):

  - that markets products or services which compete with a significant product or service of the Company, unless (1) specific written approval has been granted by the Board of Directors or a Committee of the Board for directors and executive officers, or by the General Counsel for all other employees or (2) the product or service of the business or activity is subject to a license (or similar arrangement) granted by the Company if at the time of the grant the director, officer or employee had disclosed to the Company his or her relationship to the business or activity;

  - that supplies products or services to the Company, unless (1) specific written approval has been granted by the Board of Directors or a Committee of the Board for directors and executive officers, or by the General Counsel for all other employees or (2) as to directors, the aggregate consideration for the products or services is not reasonably likely to require disclosure in the Company's public reports under applicable securities laws; or

  - that purchases products or services from the Company (other than individual purchases of products or services for personal weight loss), unless (1) specific written approval has been granted by the Board of Directors or a Committee of the Board for directors and executive officers, or by the General Counsel for all other employees or (2) as to directors, the aggregate consideration for the products or services is not reasonably likely to require disclosure in the Company's public reports under applicable securities laws;

- have any Significant Interest, including stock ownership, in any Conflicting Business unless specific written approval has been granted by the Board of Directors or a Committee of the Board for directors and executive officers, or by the General Counsel for all other employees. For purposes of this Code, a "Significant Interest" includes ownership or control (including ownership or control by affiliates or family members) of more than 5% of the outstanding securities, capital or voting interests of a corporation, partnership, or other entity, or as may otherwise be determined by the Board of Directors. In determining whether an interest is a Significant Interest, the Board of Directors, or a Committee of the Board, may take into consideration whether the interest in the Conflicting Business is of a passive, investment nature, or of an active controlling nature;

- seek or accept any personal loan or services from any Conflicting Business, except from financial institutions or service providers offering similar loans

or services to third parties under similar terms in the ordinary course of their respective businesses;

• be a consultant to, or a director, officer or employee of, or otherwise operate any other business if the demands of the other business would materially interfere with the director's, officer's or employee's responsibilities with the Company;

• accept any personal loan or guarantee of obligations from the Company except as may be legally permissible and then only with the prior approval of the Board of Directors or a Committee of the Board for directors and executive officers, or by the General Counsel for all other employees;

• conduct business on behalf of the Company with his or her immediate family members, which include spouses, children, parents, siblings and persons sharing the same home whether or not legal relatives, or the immediate family members of another employee unless specific written approval has been granted in advance by the Board of Directors or a Committee of the Board for directors and executive officers, or by the General Counsel for all other employees;

• solicit or accept from any person that does business with the Company, or offer or extend to any such person, gifts, gratuities or entertainment that could influence or reasonably give the appearance of influencing the Company's business relationship with that person or go beyond common courtesies usually associated with accepted business practice; or

• use the Company's property, information, position or corporate opportunities for personal gain.

Directors, officers and employees also shall be mindful of, and seek to avoid, conduct which could reasonably create an appearance of a conflict of interest. For example, an appearance of a conflict of interest may exist if an immediate family member consults or works for a competitor, supplier or customer of the Company. Nothing in this Code limits the duties, rights or responsibilities of a director or officer under the Corporate Agreement dated as of November 5, 2001 between the Company and Artal Luxembourg S.A., as may be amended from time to time (the "Agreement"), and nothing in the Agreement limits the ethical standards or other provisions of this Code.

For as long as Ms. Oprah Winfrey remains a director of the Company, any services or other activities arising out of or permitted by the Strategic Collaboration Agreement, dated October 18, 2015, between Ms. Winfrey and the Company, will not constitute a conflict of interest under this Code. Implementation of this policy requires full and complete disclosure by the Company's directors, officers and employees. Directors, officers and employees shall notify the Company's General

Counsel of the existence of any actual or potential conflict of interest. The General Counsel shall report these matters to the Board of Directors or the appropriate Committee of the Board.

## DUTIES OF DEFENDANTS

22.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Weight Watchers, Defendants owed Weight Watchers and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Weight Watchers in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Weight Watchers and its investors.

23.    Each director of the Company owes to Weight Watchers and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

24.    To discharge their duties, the officers and directors of Weight Watchers were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Weight Watchers were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Weight Watchers conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(e)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

25.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Weight Watchers, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## COMPANY OVERVIEW

26.     The Company offers various products and services to assist weight loss and maintenance.   The core philosophy behind the Company's programs is to use a science-driven approach to help participants lose weight by forming healthy eating habits, eating smarter, getting more exercise, and providing support.   Recently, the Company has rebranded itself as "WW" and tried to focus less on weight loss and more on maintaining general health.

27.     Weight Watchers earns revenues from subscriptions for the Company's digital products and by conducting workshops, for which it charges a fee, predominantly through commitment plans, prepayment plans, and "pay-as-you-go" arrangements (collectively, "subscriptions").   Weight Watchers also earns revenues by selling consumer products (including publications) in its workshops, online and to its franchisees, collecting commissions from franchisees, collecting royalties related to licensing agreements, selling magazine subscriptions, publishing, selling advertising space on its websites and in copies of its publications and By Mail product sales.

28.     On February 27, 2018, the Company announced its fiscal year 2017 financial results for year ended December 31, 2017 ("FY 2017"), provided its fiscal year 2018 ("FY 2018") guidance and provided its three-year fiscal 2020 ("end-of-2020") guidance.   For FY 2018, the Company stated it was on track to report revenues "approaching $1.55 billion and earnings guidance of between $2.40 and $2.70 per fully diluted share," emphasizing that the "guidance reflect[ed] the operating strength of the Company's business and expected continued global momentum through the year."   The Company also reported that it was confident in its ability to reach five million subscribers, driving revenues in excess of $2 billion, by the end-of-2020.

29.     On May 3, 2018, after the close of trading, the Company issued a press release announcing its 1Q18 financial results and updated/increased its FY 2018 financial guidance.   The

release emphasized that the Company's "End of Period Subscribers in Q1 2018 [increased] 29% year-over-year to a record 4.6 million," that its "Total Paid Weeks in Q1 2018 [increased] 27% year-over-year," and that its "Revenues in Q1 2018 of $408 million [increased] 24%, or 20% on a constant currency basis, year-over-year."  Defendants Grossman and Hotchkin commented on the release stating in pertinent part as follows:

> "Driven by *the enthusiastic, global response to our new WW Freestyle™ program*, we ended the first quarter with 4.6 million subscribers – *the highest level in the history of Weight Watchers and an increase of 1 million* compared to a year ago. *Member engagement has been incredible with members staying longer than ever before.  Average retention is now well over 9 months*," said Mindy Grossman, the Company's President and CEO.  "The world needs a leader in wellness, and a brand that can bring wellness to all.  We aim to be that leader.  By delivering a technology experience with human impact, we have the opportunity to expand our purpose and reach allowing us to generate sustainable growth."

> "In the first quarter of 2018, we delivered impressive revenue growth and continued margin expansion, doubling our operating income compared to the prior year quarter," said Nick Hotchkin, the Company's CFO. *"Based on our strong performance and continued momentum, we expect our annual revenue to grow by almost 20% and have raised earnings guidance for 2018."* [Emphasis added].

30.     Updating and increasing the Company's "Full Year Fiscal 2018 Earnings Guidance," the release stated that "[t]he Company [was] raising its full year fiscal 2018 earnings guidance to between $3.00 and $3.20 per fully diluted share," up from the "[p]rior earnings guidance [of] between $2.40 and $2.70 per fully diluted share," emphasizing that "[t]his guidance increase reflects the operating strength of the Company's business and expected continued global momentum through the year."

31.     On May 3, 2018, also after the close of trading, the Company conducted a conference call with investors and stock analysts, during which the Company provided additional positive commentary about its then present business metrics and financial prospects. During her prepared

remarks, Defendant Grossman emphasized the Company's strong ongoing momentum in both

adding and retaining existing subscribers, stating, in pertinent part, as follows:

> We ended the quarter with 4.6 million subscribers worldwide, the highest level in the history of Weight Watchers, driven by *the enthusiastic global response to our new program*. To put that into context, that's an increase of 1 million subscribers from a year ago. Furthermore, *our average retention is well over nine months, also the highest level in our company history*.

> \*     \*     \*

> Our impactful program and marketing message resonated with consumers in all of our major markets, *driving strong member recruitment throughout Q1. And in fact, our top global signup days in our history occurred in the first two weeks of 2018*.

> \*     \*     \*

> In addition to our largest market, North America, *delivering a third strong winter season in a row, our international markets performed very well with our largest Continental European markets, France and Germany, achieving record member recruits in the quarter*.

> \*     \*     \*

> *The themes that drove our performance in Q1 have continued into the spring season* with integrated marketing campaigns encompassing television, digital, social and leveraging our influencers and ambassadors.

> \*     \*     \*

> By presenting Weight Watchers, in new ways and with new voices, *we are appealing to a broader audience, who may not have considered Weight Watchers as a program for them in the past. Looking at the U.S., as an example, approximately 40% of our member signups in Q1 were new to Weight Watchers, an increase in the proportion of first-time members compared to recent years*. This strong performance today is a direct result of our execution across all of the elements of our strategic plan: excellent, effective, integrated marketing campaigns and enhanced member experience due to the efficacy and simplicity of our new WW Freestyle program; the enthusiasm and experience of our coaches and ambassadors; and the ongoing enhancements and capabilities found in our mobile app.

> \*     \*     \*

> *Our business has never been stronger*, supported by a mobile-first technology platform. And agile development approach, (00:10:18) mindset, the beginnings of a brand-led culture with integrated marketing and a relentless focus on consumer insights, as we expand Our Impact Manifesto to encompass wellness. As we make bold moves to capture the opportunities before us, I am confident in the *sustainability of our growth*, and excited about the new opportunities we have in front of us. [Emphasis added].

32.     During his opening remarks, Defendant Hotchkin (the Company's CFO) also emphasized the Company's purportedly ongoing strong subscription and retention momentum, stating, in pertinent part, as follows:

> *Our momentum accelerated in the first quarter of 2018 with strong global recruitment and retention*, driving top line growth and margin expansion.  But before I get into the results, for those of you who are newer to our story, the core of our business is our high-margin subscription business model.  *Monthly subscriptions account for approximately 80% of our total revenue, and we are able to use marketing very effectively to drive recruitment*.

> Using the U.S. as an example, the majority of our members join with a three month or longer commitment and receive a discount for that initial period, followed by monthly renewals at our full rate of $19.95 a month for online or $44.95 a month to also include meetings.

> *We have predictable seasonal trends* with approximately 40% of our annual member recruitment and annual marketing expense occurring in the first quarter. As such, Q1 bears the lion's share of the costs of attracting new members that captures only a portion of the associated revenue.  *On a global basis, average retention is now well over nine months in both meetings and online, representing more than 15% increase versus three years ago.  This reflects improvements in the member experience and increasing engagement with tools like Connect, our social media platform, embedded in our app.  We have also seen success in our long-term commitment plan offerings.  Looking at the U.S. signups in Q1, 25% chose an initial six-month plan versus only 5% taking the six-month option a year ago*.

> Turning to our Q1 performance, year-over-year recruitment growth rates comfortably exceeded levels attained during our last two winter seasons, bringing our end-of-period subscribers to 4.6 million, up 1 million or 29% from prior year, driven by very strong WW online performance. Total paid weeks were up 27% year-over-year in Q1, with double-digit gains in all of our major geographies.  [Emphasis added].

33.     Defendant Hotchkin also provided updated, increased guidance for FY 2018 and confirmed the Company remained on track to achieve its end-of-2020 goals of five million subscribers driving revenues in excess of $2 billion, stating, in pertinent part, as follows:

> With this Q1 performance and *our spring season off to a good start, we are confident that our top line strength will continue for the rest of 2018. We now expect full-year 2018 revenue slightly north of $1.55 billion, almost 20% growth year-over-year driven by continued member recruitment growth, solid retention, as well as the flow through from the higher subscriber base at the start of this year*

> Our guidance assumes we will end 2018 with roughly 4 million subscribers, which would be 25% higher than the 3.2 million end-of-period subscribers in 2017, *setting us up for a revenue and profit tailwind heading into 2019*.

> \*       \*       \*

> *We're increasing our full-year GAAP EPS guidance to a range of $3 to $3.20*, representing substantial earnings growth compared to 2017, *driven by our continued operating strength.* [Emphasis added].

> \*       \*       \*

> To provide a bit more color on our revenue forecast, in North America, our largest market, *we anticipate full year revenues to be up in the mid-teens.* In Continental Europe, we now expect full year revenue to be up in the mid-20% range. And in the UK, we expect full-year revenue to be up in the mid-teens.

> \*       \*       \*

> And finally, looking further ahead, we recently outlined our three-year goal to increase *our revenue to more than $2 billion in 2020 versus $1.3 billion in 2017*. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention with opportunities in products, licensing, partnerships, B2B and new geographies also contributing to the overall growth picture.

> As seen in our performance, *recruitment growth results in gross margin expansion*. In addition, we are managing the business to keep marketing and G&A expenses as a percent of sales relatively flat. Therefore, *we believe we have future margin expansion upside and we expect our growth rate of profit to exceed our growth rate of sales*. [Emphasis added].

34.     On May 4, 2018, the Company filed its quarterly financial report on Form 10-Q with the SEC which was signed by Defendants Grossman and Hotchkin (the "1Q18 10-Q").

35.     On May 7, 2018, the Company filed a Form S-3 shelf registration statement with the SEC that would permit Artal Group S.A. (the controlling shareholder of Weight Watchers) to sell shares whenever it sought to do so in the future (the "Registration Statement"). The Registration Statement was effective immediately upon filing and expressly incorporated by reference, among other filings with the SEC, the Company's annual report on Form 10-K for the fiscal year ended December 30, 2017, filed with the SEC on February 28, 2018.  Under instructions to Form S-1, the Company was required to comply with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") disclosure requirements of Item 303 of Regulation S-K in connection with preparing the Registration Statement.   The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

36.     On May 14, 2018, the Company filed a final prospectus with the SEC on Form 424b that comprised part of the Registration Statement (with the final prospectus, the "Registration Statement") and priced the secondary stock offering ("SPO") being undertaken for Artal at $69 per share. The Registration Statement stated that Artal would sell 7.5 million shares on a firm commitment basis, with Artal willing to sell another 1.125 million shares as the underwriters' overallotment option.   The SPO was a success, with all 8.63 million shares being sold, raising approximately $595.5 million in gross proceeds for Artal.   The lead underwriters for the SPO, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC and UBS Securities LLC, sold almost all

of those shares and collectively shared the lion's share of the more than $28.8 million in underwriting fees and costs.

37.     The Registration Statement stated the following concerning then-present demand for the Company's product and service offerings and its subscriber growth and retention successes:

> Our strong brand, together with the effectiveness of our program, loyal customer base, unparalleled network of meetings and leaders and strong digital offerings, ***enable us to attract and retain both new and returning customers.***

*     *     *

> As of March 31, 2018, we had approximately 4.6 million subscribers of our digitally enabled program, including 1.6 million members who also subscribe to our in-person meetings. Through our 360 degree experience, we connect with our members digitally through online content, our social network Connect, 24/7 chat and other social media channels. We also host approximately 30,000 Weight Watchers meetings each week around the world, run by approximately 8,600 leaders, all of whom have deep experience with our program. Our strong brand, together with the effectiveness of our program, loyal customer base, unparalleled network of meetings and leaders and strong digital offerings, ***enable us to attract and retain both new and returning customers.***

*     *     *

> We have an attractive financial profile with significant ***growth and momentum in revenues and subscribers***. We have achieved ***eight consecutive quarters of revenue growth*** on a constant currency year-over-year basis and have ***grown our number of End of Period Subscribers for nine consecutive quarters on a year-over-year basis***.

> We achieved ***our longest ever average member length of stay of well over nine months*** in our most recent quarter. Our subscription-based model provides a recurring and reliable revenue stream from meeting fees and Online subscriptions, which together accounted for 83% of our revenues and 86% of our gross profit in the fiscal year ended December 30, 2017. We believe that, with only 5% of U.S. adults who are trying to lose weight using a commercial weight management plan, we have a significant opportunity to drive increased penetration of and engagement with our brand. We further believe our deep knowledge of weight management, international presence and brand awareness uniquely position us for growth in the global wellness and weight management market.

*     *     *

Our business has significant momentum and we believe that we are in the early stages of realizing the return on our investments, which we expect will result in continued growth and profitability.

38.     Concerning the Company's "Loyal and Growing Customer Base," the Registration

Statement stated in pertinent part as follows:

Over our history, we have created a powerful global network of loyal members, growing our customer base to approximately 4.6 million subscribers as of March 31, 2018. Furthermore, our network of service providers who have achieved their weight loss goals on our program provides us with a competitive advantage.

*The quality, credibility and compelling consumer value of our offerings engender a deep affinity to Weight Watchers and enable us to attract new and returning customers efficiently. Our meeting members have historically demonstrated consistent loyalty to the brand and a significant percentage have repeatedly resubscribed to the program.*

We have also invested heavily in enhancing our digital offerings, *which has propelled significant growth in our Online business*. Our WW Freestyle program, improvements in our digital platform and services, and effective marketing, including ambassador campaigns, *have driven recruitment growth and improved our average subscriber retention rate. As of the end of our first quarter of fiscal 2018, our member average length of stay increased to well over 9 months, representing a more than 15% increase as compared to three years ago and is the longest average length of stay in our history. Also, as of the end of our first quarter of fiscal 2018, the number of our End of Period Subscribers increased 28.6% on a year-over-year basis, which was our ninth consecutive quarter of End of Period Subscriber growth on a year-over-year basis.*

The chart below sets forth our year-over-year End of Period Subscriber growth for the periods indicated.



39.     Concerning the Company's "Highly Attractive Business Model and Strong Financial Profile," the Registration Statement stated, in pertinent part, as follows:

> We are a global healthy living brand that benefits from a subscription-based model *that generates recurring and reliable revenue*, which allows us to continually make investments to support future growth. The sign-up process encourages new customers to join with a three-month commitment at introductory pricing followed by auto-renewal at our normal rate. Our efficient business model features strong gross margins and a variable cost structure, producing high margins with very low cost to serve incremental subscribers across both our meetings and Online businesses. Our Online business is asset-light and highly scalable with centralized infrastructure. Our disciplined cost management approach combined with our low capital expenditure requirements has generated significant cash flows.  [Emphasis added].

40.     On August 7, 2018, the Company filed its quarterly financial report on Form 10-Q with the SEC which was signed by Defendants Grossman and Hotchkin.

41.     On August 6, 2018, after the close of trading, the Company issued a press release announcing its 2Q18 financial results for the interim period ended June 30, 2018.  The release again emphasized that the Company's "End of Period Subscribers in Q2 2018 [increased] 28% year-over-year to 4.5 million," that "Total Paid Weeks in Q2 2018 [increased] 27% year-over-year," and its "Revenues in Q2 2018 of $410 million, up 20%, or 18% on a constant currency basis, year-overyear."  The Company also again "Raised [its] FY 2018 earnings guidance to an EPS range of $3.10 to $3.25," highlighting the Company's purportedly stellar ongoing subscriber growth, retention successes and profitability trends, stating in pertinent part as follows:

> "Our WW Freestyle™ program is resonating globally, driving *continued strong performance in all of our major markets.  We ended the second quarter with 4.5 million subscribers* – an increase of 1 million compared to a year ago – as our momentum continued during our first global, summer marketing campaign," said Mindy Grossman, the Company's President and CEO. "We have embarked on an exciting journey – from being the global leader in weight management to becoming the world's partner in wellness.  We are looking forward to the upcoming launch of our first-ever member rewards and loyalty program and to presenting our brand in a new, modernized and culturally-relevant way. We expect that these moves will

appeal to both new and existing members who are looking for a partner and a community to inspire their wellness journey."

*"We delivered strong revenue growth and continued margin expansion in the second quarter of 2018, building upon the impressive results we saw earlier in the year,"* said Nick Hotchkin, the Company's CFO. "With continued momentum expected in the second half of the year, we have raised our earnings guidance for 2018." [Emphasis added].

42.     Addressing the increased "Full Year Fiscal 2018 Earnings Guidance," the release stated that the "Company [was] raising its full year fiscal 2018 earnings guidance to between $3.10 and $3.25 per fully diluted share," up from its "[p]rior earnings guidance [of] between $3.00 and $3.20 per fully diluted share," emphasizing that "[t]his guidance increase reflect[ed] the operating strength of the Company's business and expected continued global momentum through the year."

43.     On August 6, 2018, also after the close of trading, the Company conducted a conference call with investors and stock analysts, during which the Company provided additional positive commentary about the Company's then present business metrics and financial prospects. During her prepared remarks, Defendant Grossman highlighted the Company's ongoing momentum in both adding and retaining subscribers, stating, in pertinent part, as follows:

We had another quarter of strong performance in Q2, *with momentum that continued in the spring and throughout the summer*, following the global launch of Invite a Friend and our first Summer of Impact marketing campaign.

We ended the quarter with 4.5 million subscribers worldwide, an increase of 1 million subscribers from a year ago, *due to continued double-digit member recruitment growth across all of our major geographic markets*.

And importantly, *our average retention continues to be at record levels of well over nine months. These results demonstrate the global appeal of our WW Freestyle program, supported by strong, integrated marketing execution, and a robust and engaging digital platform*.

By presenting WW in new ways, *we're starting to attract a broader and more diverse audience, bringing in many new members who may not have considered Weight Watchers as a program for them in the past*.

*Similar to what we saw in the first quarter, in the U.S., more than 40% of our member signups in Q2 were new to WW, an increase in the proportion of first-time members compared to recent years.*

\*        \*        \*

*2018 is on track to be an important and memorable year for WW. Our business is strong, supported by a mobile-first technology platform and agile development approach, a test and learn mindset, focused on consumer insights and a brand-led culture.*

As we make the next steps to move to a holistic wellness platform, we are modernizing our brand to be more culturally relevant to attract a more diverse audience and to drive continued engagement. *I am confident in our strategies to capture the growth opportunities ahead.* [Emphasis added].

44.    During his opening remarks, Defendant Hotchkin detailed the Company's increased FY 2018 guidance and reassured investors that the Company remained on track to achieve its end-of-2020 goals of five million subscribers driving in excess of $2 billion in revenues, stating, in pertinent part, as follows:

We are *increasing our full year GAAP EPS guidance to a range of $3.10 to $3.25, representing the continuing strong momentum we are driving across all of our major geographies*.

\* \* \*

To provide a bit more color on our revenue forecasts, in North America, our largest market, *we anticipate full year revenues to be up in the mid-teens.* In Continental Europe, we expect full year revenue to be up in the mid-20% range. And in the U.K., we expect full year revenue to be up in the low double digits.

\* \* \*

*Our business has strong flow-through to operating income.  For the full year, for each incremental $1 of revenue, we expect to generate at least $0.50 of incremental operating income*.

\* \* \*

Based on continued year-over-year recruitment growth and the current retention, we anticipate exiting 2018 with approximately 4 million end-of-period subscribers, up 800,000 or about 25% from where we ended 2017.

*Given the nature of our subscription business model, we anticipate this higher level of subscribers, when entering 2019, would alone translate into an EPS tailwind of approximately $0.50 in 2019.*  Note that this $0.50 positive EPS impact is independent of any member recruitment assumptions for 2019, effectively assuming flat recruitment year-over-year, and so it's just a quantification of the starting point to assist with modeling.

*We are making solid progress towards our three-year goal to increase our revenues to more than $2 billion in 2020. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention, with opportunities in products, licensing, partnerships, B2B, and new geographies also contributing to the overall growth picture.*  [Emphasis added].

45.     Despite having disclosed that the Company had actually lost 100,000 subscribers during 2Q18, because the Company once again raised its FY 2018 financial guidance and made other bullish statements reassuring investors it remained on track to achieve its end-of-2020 goals of five million subscribers driving revenues in excess of $2 billion, the stock price only declined approximately 15% that day.

46.     On August 14, 2018, Artal sold six million of its personally held shares through investment banker Morgan Stanley, which had also served as a lead underwriter in the May 2018 underwritten SPO.  Rather than selling these shares through a second underwritten public stock offering, Morgan Stanley sold these shares in individual sales exempt from registration pursuant to SEC Rule 144A, generating $464.34 million in proceeds for Artal.

47.     On October 2, 2018, Defendant Hotchkins presented for the Company at the Deutsche Bank Leveraged Financial conference, providing additional positive commentary about the Company's business metrics and financial prospects.

48.     On October 4, 2018, Defendant Hotchkins presented for the Company at the B. Riley FBR Consumer & Media conference, providing additional positive commentary about the Company's business metrics and financial prospects.

49.     On November 1, 2018, after the close of trading, the Company issued a press release announcing its 3Q18 financial results.  The Company reported that it had now lost another 300,000 subscribers in the quarter, bringing its subscriber count down to 4.2 million (from 4.6 million at the end of the 1Q18), causing the Company's reported net revenues of $366 million to significantly underperform the $379 million the Company had led the market to expect. The Company also reported an adjusted net income of just $0.94 per share, while investors had been led to expect adjusted earnings of $0.99 per share on revenues of $365.8 million based on defendants' bullish Relevant Period statements. Though Defendant Hotchkins tried to reassure investors that day that "[h]istorically, approximately 40% of [the Company's] annual member recruitments have occurred during the first quarter," and "[t]herefore, each year first quarter is [its] peak for end of period subscribers and each year end is [its] low point," that only emphasized the problem. With average subscriber contracts lasting nine months, many, many more subscriptions would be lapsing during 4Q18, precisely when the Company would be signing on the fewest number of new subscribers. As such, the Company's ability to retain four million subscribers at the end of FY 2018, much less meet its end-of-2020 goals of five million subscribers driving in excess of $2 billion in revenues, was greatly diminished.

50.     On this news, the price of the Company's common stock declined almost 30% from its close of $68.49 per share on November 1, 2018 and closing down at $48.13 per share on November 2, 2018, on unusually high trading volume of more than 13.8 million shares trading.

51.     As the *New York Post* reported, "[t]he deceleration comes amid intense competition from meal-kit companies like Blue Apron, Hello Fresh, Plated, Whole Foods and growing interest in the high-fat Keto diet."  Indeed, the Company itself announced on November 1, 2018 that it intended to overcome its drop in subscribers by expanding its tie-ups with third parties such as Amazon.com

and Blue Apron Holdings Inc.  As reported by *Blooomberg News* on November 1, 2018, the Company now planned to open an online virtual store in January 2019 via Amazon's website.  It also worked to develop meal kits with Blue Apron, which will be available in 2019 as well.

52.      However, to keep the price of Weight Watchers common stock artificially inflated, the Company's press release issued on the evening of November 1, 2018 emphasized that the Company continued to experience "continued strong consumer response" and increased Weight Watchers' FY 2018 guidance, stating the Company was on track to achieve "fiscal 2018 earnings guidance to between $3.15 and $3.25 per fully diluted share," up from the prior earnings guidance of "between $3.10 and $3.25 per fully diluted share," stating that the new guidance "reflect[ed] the Company's strong operating performance, as well as a lower tax rate."  In fact, Defendant Hotchkin opened his remarks during the conference call held with analysts and investors that evening assuring them that the Company was continuing to experience "strong subscriber trends," that it "continue[d] to make solid progress towards [its] three-year goal to increase our revenues to more than $2 billion in 2020," and that it continued to "expect to end 2018 with up to 4 million subscribers, a 12% decline from the Q1 end level, but a 25% increase in level year-over-year."

53.      The statements referenced above were materially false and misleading because they failed to disclose the following material adverse facts which were known or recklessly disregarded as follows:

> (a)      that the Company was experiencing diminished subscriber demand attributable due to the onslaught of new competing smartphone fitness apps, meal-delivery services, and other tech advances was driving down the Company's new subscriber growth and its subscriber retention rates;

(b)      that diminished subscriber growth, when coupled with the much larger number of fourth quarter subscription lapses that the Company typically experiences, made it highly unlikely that the Company would retain four million subscribers by the end of 2018;

(c)      that the Company was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020;

(d)      that a decreased subscriber count would result in decreased revenues and profits; and

(e)      as a result, the statements about Weight Watchers' business metrics and financial prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

54.      Finally, on February 26, 2019, after the close of trading, Weight Watchers issued a press release and conducted a conference call with investors and stock analysts revealing the Company's actual 4Q18 and FY18 results and financial prospects. The 4Q18 subscriber count had again declined down to 3.9 million subscribers.  The Company finally conceded that enrollment would continue declining during FY19, with Defendant Grossman revealing that while January is typically the best time for health-focused brands and when 40% of new subscribers typically join due to New Year's resolutions, January 2019 had been a "hard month" for the Company.

55.      The Company said that it was now only targeting revenues of $1.4 billion during FY 2019, nowhere near the $2 billion in annual revenues it had been projecting to achieve by the end-of-2020 and well below the nearly $1.7 billion it had led the market to expect for FY 2019. Weight Watchers also disclosed that it was now only targeting EPS of $1.25 to $1.50 per share for FY 2019, far lower than the EPS of $3.36 defendants had led the market to believe even following its prior misses in August and November 2018.

56.     During the conference call, Defendant Grossman acknowledged that the "January time period [was] such a critical component of [the Company's] recruitment for the year," emphasizing that she finally "had to be realistic and transparent about what that meant for the balance of the year," when issuing the dour FY 2019 guidance.

57.     In response to this news, the price of Weight Watchers common stock declined from its close of $29.57 per share on February 26th to close down at $19.37 per share on February 27th on unusually high trading volume of more than 37.4 million shares trading.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

59.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

60.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

61.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of Defendants Grossman, Debbane, Altschuler, Amouval, Elkins, Fajgenbaum, Kelly Lainovic, Semmelbauer, Sobecki and Winfrey.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

62.     The Company Board is currently comprised of eleven (11) members – Debbane, Altschuler, Amouval, Elkins, Fajgenbaum, Kelly Lainovic, Semmelbauer, Sobecki and Winfrey. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

63.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

64.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

65.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

66.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**THE DEMAND DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED**

**Defendant Grossman**

67.     Defendant Grossman is not disinterested or independent, and therefore, is incapable of considering demand because Grossman (as President and CEO of the Company) is an employee of the Company who derives substantially all of her income from her employment with Weight Watchers, making her not independent.  As such, Grossman cannot independently consider any demand to sue herself for breaching her fiduciary duties to Weight Watchers, because that would expose her to liability and threaten her livelihood.

68.     This lack of independence and financial benefits received by Grossman renders her incapable of impartially considering a demand to commence and vigorously prosecute this action.

69.     In addition, Grossman is a defendant in the securities class action *Potts v. Weight Watchers, International, Inc., et al.*, Case 1:19-cv-02005 (S.D.N.Y.) ("Securities Class Action").

70.     As such, Defendant Grossman cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood.

**Defendants Kelly, Altschuler and Elkins**

71.     The Company's Audit Committee is presently comprised of Defendants Kelly, Altschuler and Elkins.

72.     The Director Defendants who served on the Audit Committee are not disinterested and independent.  Pursuant to the Company's Audit Committee Charter, the purposes of the Committee are to assist the Board in fulfilling its oversight responsibilities related to: (i) the integrity of the Company's financial statements; (ii) the Company's internal accounting and financial reporting controls; (iii) the adequacy of and compliance with the Company's disclosure controls and procedures; (iv) the Company's compliance with legal and regulatory requirements; (iv) the

Company's risk assessment and risk management regarding financial reporting and legal compliance; (v) the registered public accounting firm's qualifications and independence; and (vi) the performance of the registered public accounting firm.

73.     Defendants Kelly, Altschuler and Elkins, as members of the Audit Committee, during the time each of them served, breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies discussed herein.   Thus, these Defendants also face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Debbane, Amouyal, Fajgenbaum Sobecki and Lainovic**

74.     Invus is the exclusive investment advisor to Artal.  Artal controls Weight Watchers. The principals of Invus have received compensation from Artal in connection with transactions under the Registration Rights Agreement.  Certain of directors (Defendants Debbane, Amouyal, Fajgenbaum, Sobecki and Lainovic) are principals of Invus.  Debbane is also the Chief Executive Officer and a director of Artal.

75.     Artal is a defendant in the Securities Class Action.  As such, Defendants Debbane, Amouyal, Fajgenbaum, Sobecki, and Lainovic cannot independently consider any demand to sue Artal as Invus is the exclusive investment advisor to Artal and Defendant Debbane, Amouyal, Fajgenbaum, Sobecki and Lainovic are principals at Invus.

**Defendant Winfrey**

76.     As of March 12, 2018, Artal owned more than 29.4 million shares of Weight Watchers common stock, or 44.47% of its then-outstanding shares.  Via its contractual relationships

with Oprah Winfrey, who then owned 11% of Weight Watchers common stock, Artal exercised effective control over Weight Watchers throughout the Relevant Period.

77.     Defendant Winfrey cannot independently consider any demand to sue Defendant Debbane (the Chief Executive Officer and a Director of Artal) for breaching his fiduciary duties to the Company, because that would expose Defendant Winfrey to liability and threaten her contractual agreement with Artal.

## FIRST CAUSE OF ACTION

### Against the Director Defendants for Breach of Fiduciary Duties

78.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

79.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

80.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

81.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials and internal controls.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

82.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

83.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against the Director Defendants for Waste of Corporate Assets

84.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein

85.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

86.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

87.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

88.     Plaintiffs, on behalf of Weight Watchers, have no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against the Director Defendants for Gross Mismanagement

89.      Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

90.      By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

91.      As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

92.      Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

### FOURTH CAUSE OF ACTION

**Against the Director Defendants for Violations of Section 10(b)**
**of the Exchange Act and SEC Rule 10b-5**

93.      Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

94.      During the relevant period, Defendants disseminated or approved public statements that failed to disclose the truth about the Company's business and corporate affairs as set forth above, and thus Weight Watchers' public statements were materially false and/or misleading at all relevant times.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

95.      As such, Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud; and

(b)      made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading.

96.      As a result of Defendants' misconduct, the Company is suffering litigation expense

and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC

Rule 10b-5.

## FIFTH CAUSE OF ACTION

### Against Defendant Hotchkin for Unjust Enrichment

97.      Plaintiff incorporates by reference and re-alleges each and every allegation set

forth above, as though fully set forth herein.

98.      By his wrongful acts and false and misleading statements and omissions of

material fact that they made and/or caused to be made, Defendant Hotchkin was unjustly enriched at

the expense of, and to the detriment of, Weight Watchers.

99.      Defendant Hotchkin either benefitted financially from the improper conduct,

related party transactions, and his making lucrative insider sales tied to the false and misleading

statements, or received bonuses, stock options, or similar compensation from the Company that was

tied to the performance or artificially inflated valuation of the Company, or received compensation

that was unjust in light of his bad faith conduct.

100.      Plaintiff, as a shareholder and a representative of the Company, seeks restitution

from Defendant Hotchkin  and seeks an order from this Court disgorging all profits – including from

insider sales, related party transactions, benefits, and other compensation, including any

performance-based or valuation-based compensation, obtained by Defendant Hotchkin  due to his

wrongful conduct and breach of his fiduciary duties.

101.     Plaintiff on behalf of the Company has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable

Dated: June 13, 2019

**GAINEY McKENNA & EGESTON**

By: */s/ Thomas J. McKenna*
        Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, New York 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

***Counsel for Plaintiff***

## VERIFICATION

I, David M. Keener, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this _____29th_____ day of May 2019.

DAVID M. KEENER